**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| Christopher Ounjian, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Globoforce, Inc., dba Workhuman | **(JURY TRIAL DEMANDED)** |
| Defendant. | |

Plaintiff Christopher Ounjian ("Plaintiff"), by and through his attorneys, for his complaint against Defendant Globoforce, Inc., dba Workhuman ("WH," "Defendant," or the "Company") states and alleges as follows:

## OVERVIEW OF PLAINTIFF'S CLAIMS

1.     Plaintiff worked at WH from June 2013 until the circumstances of his employment forced him to resign on September 13, 2021.  The Company provides employee reward and recognition services to its clients, which often are corporations with a large number of employees, and Plaintiff's job was selling these services.  He started as an Enterprise Account Executive.  In 2016, WH promoted him to Global Account Executive, the position he held at the time of his resignation.

2.     As part of WH's services, it administers for its clients a system whereby their employees ("Client Employees") receive recognition points ("Points," also called "GloboCertificates"), which they can redeem by making purchases at what is called the

"WH Store." Points are typically, but not exclusively, redeemed by purchasing gift cards or merchandise.

3.     Early in 2019, it came to Plaintiff's attention that when Client Employees make purchases from the WH Store, the price charged for purchased items often includes a markup percentage far in excess of the percentage the Company claims it applies.

4.     WH tells clients and prospective clients that the WH Store price covers only the actual cost to the Company for an item, plus a pass through of taxes and various administrative costs.

5.     In fact, such statements about merely passing through costs are false and deceptive. The markup above what WH actually pays for an item typically far exceeds a mere pass through of taxes and administrative costs. Both the cost of the item and the cost of shipping often are marked up. Sometimes the markups are so high that the price to a Client Employee making a purchase with redeemed Points can be three times the fair market value ("FMV") of the purchased item, or even more.

6.     WH imposes the excessive markups in order to realize significant undisclosed profits when Client Employees make purchases with redeemed Points, even though the Company claims (1) that it only is passing through costs, and (2) that, in most cases, it makes money only (a) by charging a one-time fee to implement a new recognition program, and (b) then by charging ongoing transaction fees when Points are issued. In some cases, ongoing fees are based on a per employee per month ("PEPM") charge, but this option generally does not apply to recognition programs involving Points, and no

matter the kind of ongoing fee, WH does not disclose that profits realized from the redemption of Points are a significant part of the real cost of its recognition programs.

7.     By taking undisclosed profits as part of the purchases made with redeemed Points, WH effectively deprives Client Employees of the full benefit and value of their Points, and effectively overcharges clients for the benefits they have purchased for their Client Employees.

8.     When Plaintiff complained about the excessive and undisclosed markups to WH leadership, and objected to continuing the practice, the Company acknowledged the problem, but never remedied it or even investigated it.  In fact, the Company instructed Plaintiff to remain silent about the excessive markups, and instructed him to provide misleading information to prospective clients.

9.     Plaintiff also complained about the tax consequences of the undisclosed markups and about the undisclosed expiration of Points.

10.     When Plaintiff continued objecting to WH's improper practices relating to Points (especially the undisclosed markup practices), and ultimately began disclosing the truth about back end markups to prospective clients, the Company eventually retaliated against him by threatening to demote him, or terminate him if he did not accept the demotion.  The Company additionally retaliated by misusing personal medical information about members of Plaintiff's family, suggesting that he had performance issues (in particular his "bad attitude" about markup practices), and insisting that he continue to participate in the fraudulent and deceptive practices to which he had objected and about which he had complained.

11.     When Plaintiff complained about the retaliation, a Company lawyer contacted him about doing an investigation, but to Plaintiff's knowledge, no investigation actually occurred.

12.     The Company lawyer ostensibly wanted to interview Plaintiff, but no such interview occurred.

13.     Faced with the choice of participating in fraud and deception, or leaving WH, the only viable option for Plaintiff was resignation.

14.     The practices about which Plaintiff complained, and to which he objected, constitute a violation of (1) the Florida Communications Fraud Act ("FCFA," Fla. Stat. § 817.034), (2) the Florida theft statute (Fla. Stat. § 812.014), (3) the Massachusetts larceny statute ("MLS," Mass. Gen. Laws Chapter 266, § 30), (4) the deceptive trade practices laws of Florida and Massachusetts, and (5) comparable anti-fraud and anti-deceptive trade practices laws in other states.

15.     Thus, the retaliation against Plaintiff for his complaints and objections about WH's fraudulent and deceptive practices gives rise to claims for whistleblower retaliation under the Florida Private Sector Whistleblower Act ("FWA," Fla. Stat. §§ 448.101-105).

16.     The persecution, adverse employment practices, and damaging falsehoods to which Defendant subjected Plaintiff also give rise to separate claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA," Fla. Stat. §§ 501.201-213).

17.     In the alternative, Plaintiff has a claim for wrongful termination under the "public policy exception" to the at-will employment rule in Massachusetts.

## PARTIES

18.     Plaintiff Christopher Ounjian, a former Globoforce, Inc./Workhuman employee, is a resident of Miramar Beach, Florida, which is located in Walton County.  At all times relevant to this action, he worked from Florida, and it was his conduct in Florida, including his objections and complaints about Defendant's fraudulent and deceptive practices, that resulted in the retaliation against him.  Communications about WH's retaliatory measures against him were sent to him in Florida, and he received them while in Florida.

19.     Defendant Globoforce, Inc. is the U.S. operating arm of Globoforce Group PLC, an Irish public limited company.  Globoforce, Inc. is headquartered in Framingham, Massachusetts and does business as Workhuman.  Defendant is not registered with the Florida Department of State's Division of Corporations, but at all relevant times it conducted business in and from Florida because Plaintiff worked in Florida during his employment with Defendant.  It also conducted business in Florida during Plaintiff's employment, and continues to do so, because some of its clients either have headquarters in Florida or facilities in Florida where Client Employees work.

## JURISDICTION, VENUE, AND CHOICE OF LAW

20.     This Court has jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states, and Plaintiff claims damages in excess of $75,000.

21.     This Court has personal jurisdiction over Defendant under Rule 4(k) of the Federal Rules of Civil Procedure because Defendant conducted business in and from Florida (through Plaintiff's sales work in and from Florida, and by selling services to clients

with headquarters or other facilities in Florida), and because Defendant's retaliatory communications were sent to Plaintiff in Florida. Defendant is thus subject to jurisdiction in Florida state court pursuant to Fla. Stat. § 48.193.

22.    Venue in this Court is proper under 28 U.S.C. § 1391 because Plaintiff's claims arise from retaliation he suffered for complaints and objections that he made while in Florida about illegal conduct in violation of Florida law, and Defendant's retaliatory communications were sent to him and received by him while he was in Florida.

23.    Florida law applies to the resolution of Plaintiff's claims because he is a resident of Florida and conducted most of his work for Defendant from Florida, and the misrepresentations Defendant told him to make to clients and prospective clients were in violation of Florida law. Defendant's retaliatory communications were sent to him in Florida, and the retaliation against him for refusing to engage in practices that would violate Florida law was itself a violation of the Florida Private Sector Whistleblower Act and the Florida Deceptive and Unfair Trade Practices Act.

## FACTUAL BACKGROUND

### A.    How the Workhuman Recognition Points System Works.

24.    WH offers its clients a variety of services, including a system for awarding Points as a way to recognize and reward Client Employees who perform well.

#### 1.    Payment for Points and Front End Fees for Running the Points System.

25.    WH charges most clients that purchase recognition services a one-time start-up implementation fee, which does not cover the cost of Points or the ongoing cost of

6

administering the Points system.  In some cases, the Company waives the implementation fee, but that does not alter the practice of taking undisclosed profits through excessive markups on items purchased from the WH Store.

26.     In most cases, the Company charges its clients for Points the month after they are awarded, and the charges include a negotiated percentage "transaction fee."  This fee is part of what is called the "front end cost."  For example, if a Client Employee were awarded the equivalent of $100 in Points in January, and the negotiated transaction fee was 13%, WH would invoice the client $113 in February.

27.     A minority of clients choose a per employee per month ("PEPM") fee, but this option almost never applies to recognition programs involving Points, and in no event would it affect back end markup practices.  PEPM fees are also part of front end costs.

28.     Some clients (again a minority) pay for Points when they are redeemed rather than when they are issued.  This approach has no effect on how Client Employees redeem Points or the amount WH charges for the items they purchase with their Points.

       **2.     What Happens with Money Paid for Points and with Unredeemed Points, and What are the Tax Consequences When Points are Awarded.**

29.     The majority of clients pay for points upon issuance (i.e., when they are approved and awarded to the Client Employee); and whatever the timing of payment, as soon as the Points are issued, they become the property of the Client Employee, and part of his or her income for tax purposes.

30.     If a client pays WH for Points at the time they are awarded, and the Points are never redeemed, the Company typically retains the money.  For some clients, unredeemed Points can exceed 50% of the Points outstanding.

31.     WH tells clients and prospective clients that Points never expire, but in practice, the Company expires unredeemed Points one year after they are awarded.  Within the Company, this practice is referred to as "soft expiration," because Client Employees can contact WH customer service and have Points re-activated.

32.     Because WH does not clearly disclose either expiration of Points or the reactivation option to clients or Client Employees, in practice re-activation of expired Points rarely occurs.

33.     If a client complains about the expiration of Points, WH sometimes will extend the expiration time from one year to two years, which is still contrary to the representation that Points never expire.

34.     Because clients typically report Points as income to Client Employees at the time WH credits the Points to the Client Employees' accounts, Client Employees actually can lose money if (1) their Points expire, or (2) the real value of an item purchased with the Points is less than the taxes paid on the Points.

35.     Tax withholding on Points reduces a Client Employee's take home pay for the payroll period during which the Points were awarded, and to mitigate this effect, WH urges clients to "gross up" the Client Employee's total pay by including enough additional money to neutralize the tax effects of the Points.  Grossing up adds enough income to prevent reduction of the Client Employee's net take home pay.

36.     Clients that adopt the "gross up" approach effectively pay significantly more for the recognition services provided by WH.  The extra compensation to Client Employees to defray the cost of taxes comes in addition to the initial start-up fee for implementing a recognition program and the ongoing fees for running the program.

37.     WH urges grossing up as part of its efforts to conceal the reduction in the true buying power of Points caused by excessive back end markups.  In extreme (but not unrealistic) cases, the buying power is so low that the amount a Client Employee pays in taxes for the Points exceeds the purchasing power of the Points after subtraction of the undisclosed markups.  In effect, Client Employees pay taxes on the profits that WH extracts on the back end, and if that became evident to them from reductions in their take home pay, they likely would not regard the Points recognition system as additional compensation.  Grossing up conceals this effect, but it means the client instead of the Client Employee effectively pays the improper taxation on the Company's back end profits.

38.     As a not unrealistic hypothetical example of the tax consequences of the low buying power of Points after excessive markups, a Client Employee might (1) receive $100 in Points, and (2) pay total taxes of 35% on this amount.  If the client company did not gross up the employee's pay, he or she would effectively have a $65 net benefit.  That kind of reduction would also apply if the client simply paid a $100 cash bonus, in which case the employee would still come out $65 ahead.  The same would be true for Points if their true purchasing power were not reduced by large back end markups.  To continue with the hypothetical example, the markups in some cases could reduce the true buying power of the $100 in Points to as little as $33, in which case the Client Employee would have paid

$35 in taxes on what actually was a $33 benefit.  The net effect would be that the Client Employee lost $2 because of the Points.

39.    WH could eliminate the perverse tax consequences of its excessive back end markups by reporting to clients the approximate FMV of the benefit actually conferred on their Client Employees.  In the hypothetical described in the previous paragraph, if $33 were reported as income for tax purposes, and the Client Employee's overall tax rate were 35%, the employee would come out $21.45 ahead after paying taxes.

40.    Grossing up thus facilitates the extraction of undisclosed back end profit by WH, because it effectively hides from Client Employees the true financial consequences of the low buying power of their Points.

41.    Even when grossing up mitigates the tax consequences of the Points system, however, Client Employees still lose some or all of the value of their Points if those Points are expired, or if part of the Points' value is taken as undisclosed profit by WH when they are redeemed to make purchases from the WH Store.

42.    If the Points expire, and the employer effectively has paid the taxes through grossing up, a Client Employee would have no benefit from the Points, and conceivably could lose money if the reported income pushed the Client Employee into a higher tax bracket.

43.    If a client effectively pays the taxes on $100 in Points for a Client Employee, the nominal value of Points in the example (discussed above in Paragraph 38) could still be reduced to $33 because of the back end markups, which means that the Client Employee would net $32 less than if there were no markups.  Because markups to cover sales taxes

and administrative costs would be appropriate, the actual loss likely would come to less than $32, but there still would be a reduction in the real benefit of Points.

44.     Some clients have come to understand that reporting the full face value of Points as income means Client Employees end up paying too much in taxes because the WH markups should not count as income for tax purposes.  In addition, if the client grosses up, the markups make the extra pay to Client Employees larger than necessary, thus causing the overall program to be more expensive to the client than need be.  Thus, some clients request information from WH on the FMV of what Client Employees actually can purchase with the Points, which essentially is a request for the true buying power of the Points.

45.     During Plaintiff's time with WH, when the Company received FMV requests from clients, WH would, in some instances, willfully mislead them and deny that it could provide FMV-related information to them.

### 3.     The Undisclosed and Hidden Costs of Points Redemption.

46.     Client Employees can redeem their Points by making purchases from the WH Store.  Generally, these purchases include merchandise, gift cards, travel, "experiences" (e.g. recreational activities), or charitable donations.  Except for gift cards, the WH Store generally does not ship items directly to Client Employees; rather it typically enters into agreements with other companies to provide and ship the items.  The cost to WH is what it has to pay these other companies.

47.     The Company does ship physical gift cards, and it manages the inventory of electronic gift cards and electronic deliveries from this inventory.

48.     WH tells its clients that the value of redeemed Points goes to pay for the actual cost to the Company for the item purchased by a Client Employee, plus recoupment of taxes and any administrative costs (e.g. packaging, shipping, and inventory management).  In other words, the so-called "back end markup" on the actual cost of an item supposedly covers only a pass through of the Company's actual costs, with no back end profit margin.  WH refers to this pass through of total cost as the "fully delivered cost."

49.     In practice, at least since early 2019, WH realizes a significant back end profit upon the redemption of Points.  In some cases, the back end markup is so large that the price in Points paid by Client Employees exceeds three times the FMV of the item purchased with the redeemed Points.  In addition, shipping costs are sometimes marked up as well.

50.     The extraction of back end profit has become central to WH's business model.  The intent to start realizing back end profits was disclosed within the Company and announced in multiple internal presentations in early 2019, and there are internal Company emails in which senior executives and others actually boast about the success of this strategy.

51.     Taking back end profits necessarily means that WH has to charge a large enough markup on the actual cost it pays for items in the WH Store to cover more than just a pass through of taxes and administrative costs.  Nonetheless, the Company continues to tell clients and prospective clients that (1) 85% to 95% of the redeemed Points value a Client Employee pays for an item reflects what WH paid for the item (approximately the

FMV), and (2) only 5% to 15% of the redeemed Points value is for the back end markup (which supposedly reflects only pass through costs).

52.     The claimed allocation of purchase prices (85% to 95% for the actual cost of an item, and 5% to 15% for shipping and handling, taxes, and administrative costs) equates with markup percentages of 5.3% to 17.6%.

53.     WH tells clients and prospective clients that markups average 10% to 12%, which is unsupported by any data.   Given the much higher than disclosed markup percentages, it very likely is not true.   Additionally, absent an explanation for why there are different averages for different kinds of deals, the average should be reported as a single figure.

54.     Because of the large back end profits taken by WH, the actual markup on items paid for with redeemed Points is much higher than 17.6%.   In many cases it is more than 18% even for gift cards (which generally come with a lower markup than for other items), and the cost to purchase a merchandise item with redeemed Points often exceeds three times the FMV.

55.     Consistent with its strategy for taking back end profits, WH has made concerted efforts to steer Client Employees to redemption items for which the highest back end markups can be imposed.   In particular, because gift card markups are lower than merchandise markups, the Company has taken steps that make it more difficult for Client Employees to redeem Points for gift cards instead of merchandise.

56.     If the "fully delivered cost" misrepresentation (i.e., markups cover only recoupment of WH's actual costs) were true, it would make no difference whether an

employee chose a gift card over merchandise, because neither would mean extra money to the Company.  Merchandise redemptions are favored only because they produce higher undisclosed profits.

57.    Before WH adopted its back end profits strategy, it published white papers and blogs about why gift cards should be preferred because of hidden costs in redeeming Points for merchandise.  The recent reversal to favor merchandise over gift cards is clearly part of the plan to develop a new profit stream on the back end.

58.    Since adoption of the back end profits strategy, WH has tasked its team of data scientists, which is known as "Workhuman IQ," to spin an analysis showing that Client Employees fair better buying merchandise from the WH Store rather than gift cards (in particular Amazon gift cards).  The Company's sales force, however, generally recognizes that such analyses are slanted and false.

59.    When Client Employees at a given client company have the option to select Amazon gift cards, the result often is that redemptions for those cards comprise about 40% of all redemptions in that client's recognition program.  Because WH now has back end profits as a goal, and because the Amazon option means lower back end profits, the Company goes to great lengths (including the Workhuman IQ analysis) to discourage gift cards in general, and Amazon cards in particular.

### 4.    How the Back End Profit Strategy Affects Client Employees.

60.    WH tells clients that the value of Points awarded to Client Employees enables them to purchase items from the WH Store for the fully delivered cost, i.e. cost of the item itself plus the tax and administrative costs WH incurs.  The Company never

mentions the fact that the cost to Client Employees also includes a profit margin based on marking up the cost of the item, and in some cases marking up the shipping cost as well.

61.     When WH takes a back end profit on items purchased by Client Employees, the practice directly reduces the buying power of their Points, and thus deprives them of the full benefit of the Points.  It also means clients are overcharged for the benefit actually provided to Client Employees.

62.     Because the full value of the Points is reported as Client Employee income for tax purposes, Client Employees are improperly taxed on amounts they effectively never receive.

63.     The over-taxation may be mitigated for Client Employees of clients that gross up pay, but Client Employees of other clients sometimes pay more in taxes than the value they receive when they redeem their Points.

64.     To the extent clients mitigate the tax effect by grossing up pay, they are paying more for the recognition services provided by WH.

65.     WH could address the over-taxation problem by reporting the FMV (approximately the real purchasing power of the Points) to the client.  It could acknowledge that $100 in Points does not mean $100 in purchasing power or real value.  If real purchasing power were 85% of Points value, as the Company claims, only 85% of Point value should be reported for tax purposes.  The real percentage, however, is far lower.

66.     In most cases, WH provides a client with something called an "award activity file," in which the income imputed to Client Employees is the full face value of the Points. If a client complains and requests the FMV information, the Company has the ability to

15

provide an overall estimate, which is approximately the equivalent of the true purchasing power of Points.

67.     Because of the undisclosed markups, however, such requests create a serious problem for WH.  The 85% figure typically quoted to clients simply is not accurate.  For example, if a Client Employee were taxed on $85 out of a $100 Points award, that employee would still be paying too much in taxes if an item purchased with redeemed Points cost two or three times the FMV.

68.     WH typically avoids providing overall FMV estimates, and when it does provide such information, in most cases it does not report the estimates accurately.  Rather, it misrepresents the FMV by claiming that back end markups average only 10% to 12%, which is far from the truth.

**B.      Defendant's Ongoing Misrepresentations about Back End Markups and Plaintiff's Complaints and Objections.**

**1.      Plaintiff's Initial Complaints about Excessive Back End Markups.**

69.     Plaintiff first became aware of the excessive and undisclosed back end markups early in 2019, when WH began internally communicating the intention to increase Company profits by shifting Client Employee redemptions to higher margin offerings.

70.     If the Company's statements about fully delivered costs were true, the back end markups would have included only pass through costs, and *no* profit margin.  Thus, the effort to achieve redemption profit margins without disclosing those costs to clients seemed fraudulent to Plaintiff.

16

71.     At a March 13, 2019 presentation, Sarah Whitman ("Whitman"), WH Senior Vice President of eCommerce, made clear the growth of "redemption margin" was a Company goal, by which she meant the Company would add undisclosed back end markups on items purchased with redeemed Points.

72.     The "grow redemption margin" goal was something new to Plaintiff, and it was a change WH could not achieve without effectively depriving Client Employees of the full purchasing value of their Points.  It also was contrary to representations to clients about cost pass through only.

73.     By taking a back end profit, WH effectively would be taking part of the value of Points awarded to Client Employees for itself, and it would be doing so without disclosure either to its clients or to Client Employees.

74.     The Company's misrepresentations to clients about back end markups and the expiration of Points led clients to think the value of the Points they purchased was higher than the actual value.

75.     As part of the WH decision to extract back end profits, it sought to maximize those profits by shifting redemptions from gift cards (for which only a relatively low markup increase was possible) to merchandise (for which much higher hidden profits could be realized).  The effort to shift Client Employees away from gift cards was already in effect before Whitman described it as part of her March 13, 2019 presentation.

76.     When Plaintiff recognized the significance of what Whitman had covered on March 13, 2019, he told her that prospective clients were complaining about not being able

to find gift cards in the WH Store.  He asked if there was some way to make it easier to find the gift card option on the WH Store website.

77.     It soon became clear to Plaintiff, however, that the WH plan was to shift Client Employees away from gift cards by actually making them far more difficult to find on the WH Store website.

78.     In keeping with this approach, Whitman took the position that any changes to make gift cards easier to find should only be made for clients who expressed significant concern about the issue.  Limiting such a change to clients that complained reveals a clear intent to continue hiding the gift card option from other clients.

79.     Throughout the remainder of 2019 and throughout 2020, when Plaintiff spoke with WH management, he often expressed concern about using hidden back end markups to extract profits for the Company.  The managers to whom he complained told him that WH understood the problems with this practice, and that the Company planned to change the model.

80.     Plaintiff, along with other WH sales staff members, also complained about the over-taxation associated with the Points system, and the expiration of Points without making clear to clients (1) that expiration was occurring, or (2) how the Points could be restored.  These complaints were in addition to his complaints about markups, and while a lesser concern for Plaintiff, they also led to friction with WH leadership.

81.     Despite his complaints and the assurances he received regarding back end markups, Plaintiff saw no tangible progress on stopping the back end markup profit practices.  The Company obviously had no intention of making any real change.

82.     Indeed, no later than mid-2020, it was widely recognized within WH that pushing merchandise for Points redemption was an excellent way to grow profits.  The Company was actively seeking ways to shift Client Employees to redeem for merchandise.  Secondarily, if Client Employees wanted gift cards, WH was trying to push them to redeem for the cards that let the Company realize the highest possible back end profit.

### 2.     Plaintiff's Concerns Grow Deeper and More Urgent.

83.     The undisclosed back end markup issue became more acute for Plaintiff in September and October 2020, when two WH clients (Client A and Client B), and a prospective client (Client C) raised questions about the true cost of doing business with WH, and the Company responded by misrepresenting those costs.  (Note that in the interest of preserving the confidentiality about WH's list of clients, the entities with which it does business are identified as "Client A," Client "B," etc., rather than using their actual names.)

84.     In early September 2020, a Client A employee asked Michael Davis ("Davis") of WH for the name of a WH contact with whom he could discuss (1) how much the WH program cost client companies and (2) the real buying power of Points.

85.     Davis referred the Client A employee to Plaintiff, and the employee reached out to Plaintiff about a week later to explain he was concerned about the contract his company had with WH.  He wanted to know about the costs charged when Points were awarded and the actual buying power of the Points.  He said that some gifts seemed to cost much more in Points than they actually were worth.   He said his company's procurement/sourcing team had noticed at least one redemption item priced substantially higher than the FMV.

19

86.     Michael Cassidy ("Cassidy"), to whom Plaintiff reported at WH, told Whitman about what the Client A employee had said, and she quickly responded by suggesting she could provide "talking points" to help deal with him.  She further suggested she could present the "talking points" herself.

87.     A few days later Whitman elaborated on her offer to talk directly with the person from Client A.  She suggested she could provide "some context" on how WH sources and prices merchandise.  In effect, she said that by portraying the Company as working hard to provide value for its clients she could deflect hard questions like the ones posed by Client A.  She added that in trying to sell this story, it was best to avoid people from a client's procurement department because they would press really difficult questions.

88.     Plaintiff later learned that the kind of discussion with clients to which Whitman referred often involved conscious evasion and even flat-out lies.

89.     Back end markup issues also arose in September 2020 for Client B.  WH employee Paul Condon ("Condon") managed the day-to-day relationship with this client, and in August 2020, he had commented on some difficulties with the account.  In mid-September 2020, Plaintiff followed up with Condon to learn what was at issue, and Condon responded the next day by explaining that back end pricing was the issue.

90.     In late September 2020, Whitman effectively admitted WH did not want to provide a breakdown of redemption costs to its clients, and in particular did not want to disclose the true FMV a Client Employee could purchase with Points.  When Client A asked for information about the FMV of items bought with redeemed Points, and how FMV affected the taxes paid in connection with redemptions, she told people within WH that she

20

understood such information was not the sort of thing the Company would ever want to provide.

91.     In fact, WH could have provided the FMV information, which effectively would have been the true purchasing power of Points.  Chris O'Sullivan ("O'Sullivan"), WH Vice President of Finance, made this capability clear when he responded to Whitman's suggestion that it would be undesirable.  He explained that the Company could, in fact, add the FMV data to the payroll file, and that it would be an estimate of the actual value of redemption items.

92.     Another WH employee, Rick O'Neill ("O'Neill"), a Senior Account Manager, confirmed that Client A was not using the existing FMV functionality, even though it was available.

93.     Whitman, however, persisted in telling Client A that the FMV information was not available, and no one else from WH explained the availability to Client A either.

94.     One reason WH urges clients to gross up pay is that it avoids the kind of FMV questions that Whitman sought to evade in connection with Client A.  When she insisted that providing such information was not something WH would ever want to do, she was motivated by a desire to hide the extent of back end markups.  There was no other reason WH would care about the amount of tax paid by a Client Employee or the amount of tax effectively reimbursed to the Client Employee by the client.

95.     In short, faced with a question from Client A about reducing its tax-related expenses, Whitman chose to obfuscate and lie rather than provide the readily available FMV information that would have enabled the client to reduce its costs.

21

96.     Although O'Sullivan corrected Whitman's assertion that the FMV information could not be provided, and verified that WH could indeed provide such information to its clients, at no time did he encourage her to provide the FMV information to Client A.

97.     Two days after Whitman offered to help deflect Client A's questions, similar issues arose in connection with a proposal Plaintiff was preparing for Client C, a prospective client.  He alerted Whitman that a WH competitor had raised fear, uncertainty, and doubt (often referred to as "FUD") about WH.  He also reported that Client C was looking for more details on the cost of doing business with the Company, and he asked her for some input on how to respond to questions about back end margin.

98.     Whitman promptly got back to Plaintiff and told him that the "typical" WH approach was to tell clients and prospective clients that the buying power of Points was around 85% to 95% (equivalent to saying 5% to 15% of the price to Client Employee constitutes back end cost).  She said she thought this approach remained the best way to deal with inquisitive clients and went on to elaborate on all the things that went into back end cost.  She never once mentioned telling clients and prospective clients about the additional profit WH was extracting on the back end.

99.     In fact, Whitman's suggested communication to clients about back end markups was false, as actual buying power was much lower than 85%, and the markup portion of the total purchase price for Employee Clients redeeming their Points at the WH Store was much higher than 15% because it included profit margin.

22

100.   Cassidy, who was aware of the discussions about FUD and the effort to sell WH's services to Client C, commented that the competitor was using WH's back end markups as a way to cast doubt about how the Company did business.

101.   O'Sullivan, the Vice President of Finance, also commented on the competitor's efforts to use WH's back end markups against the Company.  He admonished Plaintiff that in the proposal to Client C it would be best not to include separate language explaining that merchandise was being sold out of the WH Store on a "cost plus" basis.

102.   O'Sullivan's comment about "cost plus" was an admission that more than just costs actually incurred are passed through as part of the back end markup.  The "plus" means there was profit (undisclosed) as well.

103.   O'Sullivan's admonition to Plaintiff about not revealing that merchandise prices were "cost plus" is also an example of the way in which WH instructed Plaintiff to misrepresent to clients and prospective clients the true costs of redeeming Points.

104.   At the end of September 2020, Client C's questions cropped up again when that company's Manager for Strategic Sourcing & Procurement told Plaintiff that her company's Financial Planning & Analysis Department had asked her why WH did not provide 2019 Financials.

105.   Following the communication from Client C's Manager for Strategic Sourcing & Procurement, Plaintiff and Steve Cromwell ("Cromwell"), the WH Chief Finance Officer ("CFO"), discussed the issue of the 2019 Financials.  Their discussions included the question of what information to provide to Client C in response and what Client C should be told about back end markups.

23

106.    On or about October 1, 2020, Cromwell told Plaintiff, Cassidy, O'Sullivan, and Tom Vitkofsky ("Vitkofsky"), WH Vice President of Sales, that WH should stick with the 85% to 95% story.  He provided estimates of the total cost to Client C if that company wanted actual employee buying power of $10 million.  He assumed a 12% markup, and discussed various PEPM rates.  The 12% markup was far lower than actual markups, and any estimates based on assuming 12% would have either (1) understated the true cost of providing $10 million in actual value to Client C's Client Employees, or (2) overstated the actual value those Client Employees would receive.

107.    On or about October 2, 2020, Plaintiff told Cromwell, Cassidy, and Vitkofsky (but not O'Sullivan) that he had concerns about whether WH would honor what it was representing to clients about back end markups and about what he honestly could tell Client C.  He noted that he had been asking WH leadership for guidance on how to explain back end mark ups, and consistently had been told he should convey 5% to 15% with an average of 12%.  He then asked Cromwell if the Company would, in fact, honor such representations to clients.  If not, he pointed out, maintaining relationships with clients could be impacted.  He also had concerns about his personal reputation and integrity.

108.    Plaintiff never received any response to the questions he posed on or about October 2, 2020.

109.    After he raised the markup issue regarding Client C, Plaintiff had thought WH might finally take some action to correct the excessive back end markups, but no corrective steps were taken.

110.    WH sales leadership continued to assure Plaintiff, however, that change was imminent, and he once more gave them the benefit of the doubt.  Unfortunately, yet again, there was no tangible progress, and clients kept raising complaints about the back end issue.

111.    By mid-November 2020, mounting evidence made it very clear that WH did not intend to forego back end profits.  Communications from Whitman showed that nothing had changed with regard to the markups, and, if anything, that the Company had decided to double down on its efforts to extract the maximum possible back end profits without any disclosure to clients.  A key element of this plan was promoting redemptions for higher margin merchandise.

112.    Whitman referred to "driving users into higher margin lanes," by which she meant, among other things, that the WH website should be altered to hide lower margin items like gift cards so Client Employees could not easily find such items.

113.    Again, if WH were not including profit in the back end markup on top of pass through costs, there would be no motivation to steer redemptions to one type of item over another type of item.

114.    To the extent Client Employees opted for gift cards, WH wanted to drive them away from lower margin cards to higher margin cards.

115.    For some gift cards, WH receives a discount from the card provider.  For example, a card with $100 face value might cost the Company only $90, which makes it easier to realize a back end profit without marking up the price as much as would be required without a discount.

25

116.   Other gift cards, most notably from Amazon, do not come with a significant discount to WH, so the Company has to either take a smaller profit on the back end, or mark them up more.  Such cards are called "premium gift cards."

117.   In many cases, the markup on gift cards (especially premium cards) exceeded 18%.  It sometimes reached as high as 25%.

118.   If offered Amazon gift cards, Client Employees tended to prefer them over other cards and merchandise.  Because WH typically made less back end profit on Amazon cards than on other items, however, the Company tried to steer both clients and Client Employees away from them.  Sometimes the Company even told clients they were not available for inclusion in their recognition programs when, in fact, they were.

### 3.   Plaintiff Becomes Further Concerned in 2021 and Communicates His Concerns More Clearly and Forcefully.

119.   By the end of 2020, it became apparent to Plaintiff that WH was right where it was in March 2019 with regard to undisclosed back end markups, as the Company had not changed its practices.

120.   At the beginning of 2021, additional complaints from clients made the issue even more acute for Plaintiff.  While some clients and prospective clients had at least started to ask probing questions about the back end practices, their questions were met with false representations about the relevant markup percentages, and most clients (even those who raised complaints or questions) apparently had no idea how their Client Employees were being shorted on the full value of their Points.

121.    When a client or prospective client asked probing questions, the response from WH was always misleading and deceptive, and few, if any, of those who raised questions were ever able to discern the full magnitude of the back end profits.

122.    At the end of January 2021, an employee working for Client D informed Plaintiff that other Client D employees had raised concerns about how items available for redemption through Client D's recognition program seemed remarkably overpriced.

123.    Earlier in January 2021, one Client D employee inquired about paying the difference for an item if he did not have enough Points.  He also asked if Points ever expired.  Trystan N. of the WH Customer Service team responded that Client D employees could pay the difference with credit cards, and that while *Points did expire* (an admission that was contrary to what WH told many clients), they could be reinstated.

124.    The Client D employee who first raised questions about Points redemption with Plaintiff had discussed these issues with other Client D employees, one of whom said he was disappointed with WH, especially regarding the prices for items in the WH Store. He reported that Apple Airpods, for which the WH Store required $444 in Points, could be acquired from an Apple reseller for just $270.  This Client D employee worked outside the U.S.

125.    Another Client D employee, who worked in the same country, asked if such differences were unique to his country and whether there was any explanation for the high WH Store prices.

126.    The Client D employee who contacted Plaintiff responded to the others by citing a Frequently Asked Questions ("FAQ") answer regarding markups on merchandise

27

and gift cards offerings.  According to this FAQ answer, which was part of the information provided through Company D's recognition program, the markup was the cost of procuring merchants to offer their products on the recognition platform as well as to ship merchandise to recipients.

127.    The answer to the FAQ reflects, and is based on, false statements made to Client D by WH.

128.    One of the Client D employees who worked outside the U.S responded that he knew there was a markup, but he was surprised it was so huge.

129.    The Client D employee who contacted Plaintiff informed him of her exchanges with other Client D employees.  She told Plaintiff their comments illustrated a problem about which she had been telling Plaintiff for some time.

130.    Plaintiff's contact at Client D later sent other examples, and on or about January 26, 2021, Plaintiff told Vitkofsky, Cassidy, and Alex Paz ("Paz," an Enterprise Account Executive with WH) about one of these examples.

131.    Plaintiff had earlier alerted Vitkofsky about the markup issues raised by Client D, and Vitkofsky had asked for a specific example.  Plaintiff now told him that the example discussed in the preceding paragraph showed the negative impact of back end markups and merchandise markups.  Plaintiff added that he personally would not use Client D as a reference because of the hidden back end cost issue.

132.    Immediately after informing Vitkofsky about the example from Client D, Plaintiff, who was growing ever more concerned and vocal about the back end misrepresentations and deceptions, also informed Devon Wallace, a Senior Customer

Success Manager at WH, and Jay Ledbetter ("Ledbetter"), Director of Strategic Accounts at WH.  Plaintiff told them he had escalated this concern to Vitkofsky and Cassidy because he believed it would not be addressed properly just by having Whitman pass it along to Rick O'Neill (a Senior Account Manager).

133.    Ledbetter set up a meeting with Whitman and O'Neill, and Plaintiff asked Vitkofsky and Cassidy if they wanted to be involved.  Plaintiff told Vitkofsky and Cassidy he believed it was more important to Whitman that WH maintain profit margins as opposed to growing top line revenue.  He told them Whitman could not be the solution; if she were, they already would have seen tangible improvements.

134.    Vitkofsky at least seemed to grasp and understand the back end issue.  On or about February 2, 2021, he told O'Sullivan (Vice President of Finance), Whitman (Senior Vice President of eCommerce), Cromwell (CFO), and Jason Griggs (WH Senior Vice President of Global Sales) that, as they knew from previous discussions, the WH pricing/business model was under increased levels of scrutiny from both prospects and existing clients.  More now than ever, back end markups were the center of attention.

135.    Vitkofsky's concern about the undisclosed markups was not whether they were proper or legal, but only the problems the Company was experiencing as it tried to push them on clients.

136.    Very shortly after telling O'Sullivan, Whitman, Cromwell, and Griggs of his concerns, Vitkofsky also told Cassidy and others.  He said he would "let you know where this goes," and added they would have to start somewhere on addressing the back end issue.

137.    On or about February 3, 2021, Cassidy let Plaintiff and others know about the discussions regarding the back end markups, but he told Plaintiff not to share the information.  It was for Plaintiff's review only.

138.    Two days later, Vitkofsky, apparently unaware that Cassidy had already brought Plaintiff into the loop, separately told Plaintiff, Paz (Enterprise Account Executive), and John Flavin ("Flavin," another Enterprise Account Executive) about the ongoing back end discussions.  Vitkofsky acknowledged that all three (i.e. Plaintiff, Paz, and Flavin) had been sounding the alarm on markups and then irately pleaded for them to back off.  He told them their "continual barrage of negativity around pricing and our markup" had left him mentally exhausted.  He asked that they give him a "mental reprieve" while he tried to fix things.  He said he had "the ear of the right people on this topic," but cautioned that change would not come overnight.

139.    Vitkofsky added that Plaintiff, Paz, and Flavin were "preaching to the choir," an acknowledgement that their concerns about back end markups were fully justified.

140.    Notwithstanding this acknowledgement, Vitkofsky's actual feelings on the back end issue had been better expressed to Plaintiff and Paz about 40 minutes earlier in connection with the Client D situation, about which Vitkofsky wrote that WH's immediate reaction could not be to drop prices based on a handful of complaints.  He suggested that it might just be a matter of Client D employees having some trouble adjusting to recent changes in the recognition program for their company.

141.    Vitkofsky's reference to Client D employees having to adjust derived from the fact that while half of them had been rewarded with Points for a long time, Client D

30

had been providing cash awards to other employees, which entailed no back end costs. Vitkofsky was speculating that the high markups for non-cash redemptions had caused former cash award employees to complain.

142.   Plaintiff responded almost immediately to Vitkofsky's plea that he and others "back off" by asking just what he was to do while waiting for change to happen.  He asked for clarity from WH on how to respond when asked about back end markups.  He pointed out that almost everyone at WH knew the language on the true cost of redemptions had to be updated.  He sent the language in question to Vitkofsky in an email so there would be no doubt about what was at issue.

143.   The language Plaintiff emailed to Vitkofsky is what many, if not all, WH clients were told by the Company about back end markups, and it vastly misrepresents and understates the actual markups.  It included a statement that 85 to 95 cents of every dollar awarded to a Client Employee would be applied to the cost of the item they selected from the WH Store.

144.   The actual purchasing power available to Client Employees was significantly less than 85 to 95 cents on the dollar because of the extraction of back end profits by WH. The Company's actual practices effectively deprived Client Employees of the full value of the Points they were awarded.

145.   Additionally, the language Plaintiff emailed to Vitkofsky included a statement indicating WH was "agnostic" about what Client Employees chose when they redeemed Points, which also was not true.  Whitman and others had been explicit about

how the Company wanted to steer Client Employees to merchandise instead of gift cards, and to more lucrative (for WH) gift cards if not merchandise.

146.    As with virtually all of Plaintiff's complaints and objections about the back end practices, he never received any answer to the questions he raised in his response to Vitkofsky's request that he and others "back off."

147.    Whitman's efforts to reduce redemptions for gift cards in general, and Amazon gift cards in particular, further belie the "redemption agnostic" claim.

148.    When he responded to Vitkofsky's "back off" plea, Plaintiff said he did not see how WH could continue making such misrepresentations (i.e., the 85% to 95% purchasing power representation and the redemption agnostic representation) to clients and prospective clients.

149.    Plaintiff's concerns about the back end misrepresentations were quickly deepening.  A few days after the response to Vitkofsky, on or about February 11, 2021, Plaintiff explained these concerns again in connection with a proposal he was preparing for Client E.  Plaintiff told Cassidy that Client E wanted an updated proposal and asked for guidance because he was no longer comfortable providing the "standard" percentages on markups (5% to 15%, and averaging 10% to 12%).  He told Cassidy those percentages were not what WH actually was delivering.

150.    Plaintiff also let Paz, Flavin, and Scott Appleton ("Appleton"), an Enterprise Sales Representative, know about his concerns and what he had told Cassidy.  Plaintiff told them he was taking every opportunity to push WH be clear on what the Company wanted him to tell prospects.  If the Company stuck with the "5% to 15%, and averaging 10% to

12%" language, would it in fact deliver on that promise?  If not, what would the actual

numbers be, so he would know what he honestly could tell a prospect?

151.   As part of his ongoing efforts to correct the back end markup fraud and

deception, Plaintiff discussed the issue with both O'Sullivan and Cassidy, but in particular

with Cassidy.

152.   Plaintiff and Cassidy discussed how O'Sullivan wanted to communicate to

clients about 85% to 95% buying power, and not about a 5% to 15% markup, a minor

distinction at best.  Aside from the fact that 85% to 95% buying power does not equate

exactly with a 5% to 15% markup (the correct percentages would have been 17.6% markup

for 85% buying power, and 5.3% for 95% buying power), the distinction makes little

difference, because no matter whether WH was communicating the buying power range or

the markup range to clients and Client Employees, the numbers significantly understated

how the markups would affect the real value of Points.

153.   Even for gift cards, markups were mostly higher than 15%, which Plaintiff

pointed out to Cassidy.  He said WH should be honest about the true markup for gift cards.

154.   The markups for merchandise were much higher than the gift card markups,

but WH deceptively disclosed only the percentages for gift cards, which effectively

concealed the true profit margin for merchandise.

155.   Plaintiff told Cassidy that concealing the truth about merchandise markups

was particularly problematic because the Company was trying so hard to make the

redemption of gift cards more and more difficult.  Misusing the gift card percentages when

merchandise was such a big part of the redemption program had to be wrong, and for some

Client Employees it was especially wrong because merchandise redemption was their primary option.

156.   Cassidy responded to Plaintiff's concerns by suggesting that determining the right percentages for merchandise was very difficult, and that the Company did not have a good answer.  He said it would probably be best if they took up the discussion with Cromwell.

157.   In fact, Plaintiff had repeatedly raised concerns with Cromwell to no avail. Cromwell never responded to Plaintiff.

158.   Thus, Plaintiff was not satisfied with the suggestion about going to Cromwell, and he told Cassidy that the current WH practices put both him and the Company in a very difficult situation.  WH was forcing Client Employees to redeem Points for highly marked up merchandise, but there was no transparency about the true cost to the Client Employees.  He suggested that the Company might consider offering gift cards only until there were accurate data on markups for merchandise.  He pointed out that both his credibility and the Company's were on the line.

159.   Referring to Client F, which had insisted on limiting markups for gift cards, Plaintiff asked Cassidy what good the limit did if the Client Employees working for Client F could not find the card redemption option on the WH website.  Plaintiff cautioned that the Client F situation could "blow up" for WH.

160.   Client F was  aware of back end markups and had negotiated a fixed markup on gift cards in its contract with WH.  Client F had not negotiated any fixed markups on merchandise, however.

161.    WH acted in bad faith when, after negotiating the fixed markup for gift cards with Client F, it then attempted to steer Client Employees away from gift cards.

162.    On or about February 17, 2021, Plaintiff reminded Cromwell that he needed some guidance on how to quote back end markups, particularly for merchandise.  No one ever responded to his request for guidance.

163.    Back in October 2020, Plaintiff had been negotiating to bring Client G in as a WH client.  On or about February 22, 2021, he sent a copy of questions that Client G had raised in October to Cromwell, Cassidy, and O'Sullivan.  He also sent them his response to the Client G request for proposal ("RFP").

164.    Also on or about February 22, 2021, Cassidy forwarded the October 2020 Client G questions to Whitman and asked for her help on "our messaging to [Client G]." He told her that Client G was beginning to dig into the total cost of WH's services.  He said that while he understood the messaging about 85% to 95% buying power, given Client G's "level of questioning," providing more details with respect to merchandise markups would be helpful.

165.    Whitman responded with a lament about the "challenges" the situation presented and an explanation for the evasive stories WH had been telling prospects and clients.  She then effectively admitted to the Company's deceptive and fraudulent practices. She said it would be possible to pull some data for the U.S., but that it would not be favorable for WH.  She said that when the Company had looked into the issue in the past, most items were considerably more than 30% to 50% over the manufacturer's suggested retail price ("MSRP"), which she felt was hard to defend.

166.    Whitman also said that WH prices were more than 25% over MSRP *even before the cost of shipping and taxes*.  She then pulled a shell game switch and noted that the WH Store prices incorporated shipping and tax, so an apples-to-apples comparison of MSRP with WH Store price was not appropriate.  While the latter might be true, it by no means explains why the WH Store prices would be 25% over MSRP *before* shipping and tax costs.

167.    Whitman concluded by repeating the evasive story she had been urging people within WH to tell clients.  The high merchandise markups, she said, was the reason WH should stick with the "talk track" of merchandise being a cost-plus model based off of the Company's extensive network of suppliers and the costs it is able to procure based on buying power at the individual brand and item level.  If those points were true, the WH Store should be offering prices commensurate with typical retail prices or perhaps even lower.  Why Whitman thought this message could deflect client concerns about markups is not clear, except that it avoided providing any hard numbers.

168.    Whitman also pushed a second part of the "standard message," another shell game switch, in which she shifted to an emphasis on how WH pricing was on a "fully delivered" basis.  Conveniently omitted was any explanation of why prices were so much higher even before shipping and handling costs were taken into account.  Also undisclosed was WH's practice of extracting even more profit by adding undisclosed markups to shipping costs, which supposedly were passed through with *no* markup.

169.    Whitman additionally wanted to highlight how the Company focuses on the "power of choice" so that Client Employees have the option to decide whether to purchase

36

merchandise or a gift card.  As made clear above, however, the "choice" part of the story was a pure fabrication, because WH strove mightily to channel Client Employees to merchandise instead of gift cards.

170.    Referring to ways the data might be manipulated to make things look better, Whitman suggested she had a few ideas about some analyses WH could run with regard to the WH Store prices for items that actually were selling, and how those prices compared with MSRP in the U.S.  She said such analyses might "paint a slightly better picture," but she was not sure.

171.    Whitman's statement about focusing "on the power of choice" is completely belied by her multiple presentations on how to influence Client Employees to use their Points on higher margin redemptions, her strategizing about how to keep Amazon gift cards out of client programs, and the scheme to make all gift cards difficult to find in WH Store.

172.    Cromwell also was reluctant to confront the issues raised by Client G.  Thus, Plaintiff told Cassidy on or about February 22, 2021 that it felt to him, as Cromwell just wanted to kick the can down the road.  He said some prospective clients were asking legitimate questions about the WH pricing model and that the Company was charging much more than taxes and shipping as part of the "fully delivered" cost.

173.    Plaintiff told Cassidy he would prefer to have frank and honest discussions with prospects up front rather than have his integrity and the Company's integrity questioned later.  He said that if the business model in fact was to extract back end profits, then WH owed its prospective clients full transparency about it.  Once again, he pointed

37

out the problems causes by the misleading and outdated "5% to 15%, averages 10% to 12%" representations to prospects.

174.   Plaintiff also told Cassidy it was very troubling that Whitman continued to suggest manipulation of data to make WH appear more cost competitive than it was.  He asked what Cassidy thought the next steps should be toward fixing this situation.

175.   In addition to the February 22, 2021 and February 24, 2021 discussions about Client G, Client E became the subject of discussion in late February 2021.  Michael Robb, WH Director for Sales Enablement & RFPs (i.e., Requests for Proposals), asked Plaintiff on or about February 22, 2021 about the status of negotiations with Client E.

176.   Plaintiff explained that Client E had been waiting on an updated price proposal for more than a week, and that he was trying to get some clarity on what to say about the back end pricing.  Again, he pointed out that WH's then current language was outdated because it only referred to gift cards, and because the percentages were wrong. He said he was not comfortable using that language anymore, and that he was waiting for Cromwell or someone else to tell him what the updated language should be.

177.   On or about February 26, 2021, there was an additional exchange between Cromwell and Plaintiff about bringing Client G in as a client.  One issue Plaintiff addressed was the "purchasing power" of Points.  He told Cromwell that WH initially had provided the normal response (i.e. 85% to 95% purchasing power) and added that this language seemed outdated.  He said there were few, if any *gift cards* for which the markup was as low as 5%, and that the oft-quoted "10% to 12% average" seemed far too low.  Plaintiff said Client G was specifically asking about merchandise, so using the gift card percentages

was inappropriate, which is why he was looking for guidance on what he honestly could tell prospective clients.

178.   Shortly after his exchange with Cromwell, Plaintiff complained to Cassidy that Cromwell was looking for him to agree about providing evasive and misleading answers to Client G.

179.   A few days later, on or about March 1, 2021, Cassidy suggested Plaintiff tell Client G that if one of its Client Employees redeemed Points for a gift card, the buying power of the Points would be between 82% and 90%.  Cassidy further suggested that with respect to merchandise, what Client Employees see as the cost on the WH website is "the fully delivered cost, inclusive of taxes, shipping, etc."  He added that there would be no additional fees, either to Client G or its Client Employees, and said that communicating the foregoing information to Client G would be truthful and would not "overpromise."

180.   In fact, Cassidy's suggestions sidestepped the issue of markups on merchandise.  Moreover, with regard to gift cards, the statement about buying power as low as 82% was an explicit admission that representations to clients about 85% buying power at the low end were untrue.  Likewise, representations that buying power is as high as 95% are belied by Cassidy's statement that the top of the range is 90%.

181.   Plaintiff promptly replied to Cassidy's suggestions and told him his proposed language did not come anywhere close to capturing how much WH was marking up the prices in the WH Store in pursuit of its profit margin goals.  Plaintiff added that his credibility and the Company's credibility would be lost once Client Employees began to

redeem Points.  They would feel misled.  Plaintiff told Cassidy that to him, it just did not feel right.

182.    Cassidy promptly conceded that he did not disagree about the inadequacy of his suggestions.  He added, however, that he did not think Plaintiff would get approval from WH for any more truthful language "at this point."

### 4.    Plaintiff Proactively Starts Providing More Truthful Information to Prospective Clients.

183.    By early March 2021, Plaintiff's concerns regarding obfuscation about back end markups were growing deeper yet, and he expressed his frustration about the situation to Kieran Conlon ("Conlon"), Vice President for International Sales & Services for WH, and Beth Harper ("Harper"), a WH Enterprise Sales Representative.  He told them that lately he had been holding off on quoting anything to prospective clients without a better statement regarding the back end markups.  He said he would wait to get accurate pricing from Cromwell for Client H, but he added that he did not really expect an answer from Cromwell.

184.    The day after the communications with Conlon and Harper described in the preceding paragraph, Plaintiff sent Conlon some updated language he contemplated using in a proposal for Client H.  With regard to gift cards, it included a statement that if a Client Employee redeemed Points for a standard gift card, the buying power of the Points would be between 80% and 90%.  For premium gift cards, the range would be between 75% and 85%.  With respect to merchandise, the proposed language began by essentially following the "Company line."  It included a statement that what Client Employees see as the cost in

the WH Store is the "fully delivered cost, inclusive of taxes, shipping, etc.  There are no additional fees to the employee."  It also said that WH strives to provide value for Client Employees.

185.   Plaintiff's proposed language regarding the price for merchandise did not, however, hew completely to the "Company line."  It also made explicit that the final price for an item could be below *or above* MSRP, and added that this price variability was why the power of choice is so important.  It said that Client Employees could choose merchandise "based on selection and the fully delivered cost," *or redeem for a gift card and use it to purchase that same item directly from a store at a more favorable price.*

186.   Despite the more accurate disclosure of gift card markups in the version of the proposal language he sent to Conlon and the suggestion about buying gift cards instead of merchandise under some circumstances, Plaintiff felt that the "no additional fees" language remained misleading.  Therefore, the proposal he actually sent to Client H contained even more truthful language, which revealed that the redemption price for merchandise might be as much as three times the market price.

187.   Conlon responded to the initial version of the new language (not the better version actually sent to Client H) with a question about whether the proposal to Client H could even be so truthful on the real buying power of the gift cards, and Plaintiff responded that he would remove it "if you think it's best."  He added, however, that he was increasingly uncomfortable and frustrated that the WH business model required the sales staff to deceive clients.

188.   Conlon replied that he also was very uncomfortable about the disclosure, and he had said as much on multiple occasions to Griggs, the Senior Vice President for Global Sales.   He also said the proposed language should be discussed with Cromwell and O'Sullivan.

189.   Plaintiff then specifically asked for Conlon's thoughts, and gave his opinion that while the proposed language might not help win deals, misrepresenting the WH business model would be even worse.

190.   With regard to gift cards, as a way to compromise on Conlon's concerns regarding the Client H proposal, Plaintiff eventually disclosed only the markups on the "standard" gift card offering, as the Company preferred not to include premium (more expensive in terms of markup) gift cards in the redemption offerings for Client H's Client Employees.

191.   Plaintiff received no direction in response to his inquiries about what to put into the Client H proposal with regard to back end markups for merchandise.   Thus, he decided proactively to use the stronger language that eventually was included in the actual Client H proposal.   That is, he disclosed that merchandise paid for with Points might cost up to three times the FMV.

192.   On or about March 17, 2021, Plaintiff sent the proposal to Client H by way of an email with a link to a file sharing site, and the next day he forwarded it as an email attachment to O'Sullivan and Cassidy, with whom he'd already discussed what he intended to do with regard to disclosures.   Thus, WH was fully aware of the new disclosure he was starting to use in his proposals.

193.    Plaintiff sent out no more proposals in 2021 until late June.  In the interim, however, the issue of what to tell prospective clients about the real cost of redeeming for merchandise was discussed further within WH.

194.    Through May 2021, the full disclosure issue remained in flux, as evident in an early May exchange between Plaintiff and Cassidy.  Plaintiff asked if there was any updated language on pricing.  He said he was being asked for a proposal and still was not comfortable with the "5% to 15%, averages 10% to 12%" language because it was not aligned with what WH actually delivered.

195.    Cassidy responded that Plaintiff could disclose 82 cents to 90 cents on the dollar purchasing power for gift cards, which he said was accurate.  For merchandise, he suggested the language used in the Client H proposal, which he said was "pretty direct." Again, the 82 cents to 90 cents statement belies representations to clients and prospective clients that the purchasing power of Points ranged from 85% to 95%.

196.    Because WH annual billings now approach a billion dollars, even a small percentage increase in the back end profit margin (e.g. from 15% to 18%) translates into very significant additional profits.

197.    The Client H language that Cassidy suggested Plaintiff might use with other prospective clients was not the version Plaintiff ultimately used in the Client H proposal. It did not include the disclosure in the final Client H proposal that merchandise might cost three times as much as the FMV if bought through redeeming Points.

198.    The disclosure language Cassidy proposed to Plaintiff in early May 2021 also was unclear about the distinction between gift cards and merchandise.  Unlike the language

43

Plaintiff actually used for the Client H proposal, the language Cassidy proposed still fudged the distinction between gift cards and merchandise and hid the true cost of merchandise.

199.    At the end of Plaintiff's early May exchange with Cassidy, he asked if WH was moving towards a Company standard for disclosure language, and then said he continued to feel uncomfortable because he was not sure if what he was conveying was accurate.

200.    Cassidy responded that the plan was to develop better standard language, but never addressed Plaintiff's concerns about the accuracy of then current disclosures.

201.    As explained in detail below, WH acknowledged in May 2021 that gift card redemption could be made much easier for Client Employees, but the Company decided not to do so except when a client complained about the problem.

202.    A mid-May exchange among Cassidy, Whitman, Plaintiff, and Amy Martin ("Martin"), Senior Director for Launch and Customer Programs at WH, addressed issues relating to making redemption for gift cards easier for Client F's Client Employees.  At the end of the exchange, Plaintiff objected to Cassidy about the practice of delaying any change in the visibility of the gift card option until a client complained to WH about the problem.

203.    Specifically with regard to Client F, Plaintiff told Cassidy that this client was not in a position to pay large bonuses.  Thus, the Chief Human Resources Officer ("CHRO") for Client F was trying to use WH's recognition services as a gesture of good will to that company's employees.  It would be a starting point to improve culture and send a message that the Client Employees were valued.

44

204.   Plaintiff told Cassidy that Client F was *very* sensitive about back end markups and had negotiated very hard to limit markups for gift cards.  Merchandise redemptions had not been addressed, however, and if Client F had known about WH's efforts to hide gift cards, the markup on merchandise might have been included in the negotiations, or Client F might have gone with another client recognition vendor.

205.   Given that history, Plaintiff cautioned that if WH waited for Client F's Client Employees to complain, it would embarrass the CHRO and likely kill WH's relationship with Client F.

206.   Plaintiff told Cassidy that treating clients in such a fashion (i.e., waiting for them to complain before fixing the "hidden gift card" problem) was "insanity."  He said that a clear message had to be sent to Company leadership that waiting until clients complained before making it easier for Client Employees to find the gift card option would often be too late to maintain relationships.

207.   Cassidy sent some of Plaintiff's comments about the Client F situation to Whitman, Martin, O'Neill, and O'Sullivan.  He softened Plaintiff's message by complimenting the launch team for setting up the Client F account, and said that with the launch scheduled for early July 2021, the potential goal should be to take proactive measures for "this specific account," rather than waiting for complaints about gift card visibility.

208.   Cassidy pointed out that Plaintiff had worked for many years to land Client F's business for WH, and that everyone at the Company should be concerned about making

45

the launch go exceptionally well for the Client Employees and about making the CHRO look good in the process.

209.   Whitman pushed back against Cassidy by suggesting that overall there actually had been few complaints about difficulty navigating the website to find gift cards, which contradicted what she had said in April 2019, when she reported that 20% of clients had complained about Client Employees having problems finding the gift card option.

210.   Whitman went on to recommend that WH launch the Client F site in the same way that it launched sites for other clients.   That approach, she said, would involve addressing issues like gift card visibility only if and when they arose.

211.   Whitman's recommendation regarding Client F was in fact the standard approach taken by WH to defuse client complaints.   This approach involved fraudulent and deceptive statements about how Points redemption actually works.   The standard drill was to wait for a client to complain, and then for Whitman to get on the phone with the client to provide misleading information.   She never disclosed that the high costs (which triggered the complaints in the first place) are due to WH adding significant, undisclosed back end markups.

212.   Martin too had reservations about proactively making gift cards more visible for Client F's Client Employees.   She earlier had suggested that if WH made an unforced change, and some other issue arose in the future, the Company would have "no leverage to show compromise."   Her comment was a tacit admission that complaints about pricing are regular and expected, which is contrary to Whitman's claim that they are rare.

213.    Plaintiff responded almost immediately to Whitman's objection to a proactive effort to make gift cards more accessible to the Client Employees of Client F, but again addressed his response only to Cassidy.  He told Cassidy that new clients do not complain about the specifics of navigating the WH website because they don't know what they don't know.

214.    Plaintiff added that clients, almost without exception, do complain about the eCommerce hidden cost.  Thus, it was misleading to say nobody complains.  Moreover, old customers, who were familiar with the WH website when gift cards were easier to find, hated the new website, and some of them demanded that it be changed back to the earlier version.

215.    Plaintiff thus disagreed with Whitman's recommendation to "wait until they hate it and then deal with the fallout."  He also told Cassidy that Whitman was wrong when she said changing navigation options on the WH website would not solve any particular problem.  Plaintiff said she was wrong on two counts.  First, the change did not really relate to the way Client Employees navigated the site, but rather to the misleading language they saw when attempting to navigate.  It was not a road system without signs.  The problem was the signs were misleading or wrong.  Second, contrary to what Whitman said, fixing the "road signs" would solve a problem.  It would make redemption for gift cards far easier for Client Employees who wanted to exercise that option.

216.    Cassidy and Plaintiff subsequently further discussed the "wait till they complain" issue, and Plaintiff concluded this discussion by pointing out that Client F was concerned about hidden markups.  Client F had negotiated caps on the markups for gift

cards, and now WH was hiding gift cards from its Client Employees.  "That," Plaintiff said, "is fraudulent."

217.   Despite Plaintiff's ongoing efforts to obtain clarification on how to reconcile what WH told its clients about back end markups and the Company's actual practices, he never received any guidance on how to tell clients the truth.

218.   Although Plaintiff never received any of the guidance he requested, WH eventually did respond to his persistent efforts to provide more truthful information to clients.  As described below, the response came in the form of a suggestion that he accept a demotion, which was a clear attempt at pressuring him to leave, and when he subsequently resumed sending proposals with the "up to three times actual cost" language to prospective clients, the pressure to take a demotion or leave became far more intense.

219.   In late June 2021, Plaintiff was involved in putting together a proposal for Client I, and in the course of preparing this proposal, he reiterated to Cassidy his long-running question about what to do regarding the back end markup.  Once again, he said that he did not know how to explain the back end margin to prospective clients.  What he did know was that the "5% to 15%, average of 10% to 12%" language was not accurate. He asked for guidance on what language to put into the proposal for Client I.

220.   Cassidy replied that he liked to say markups on gift cards range between 5% and 18%, with the majority between 10% and 15%.  He said he thought an accurate average markup was probably close to 14% for all gift cards.  Merchandise, he added, could range from below retail price to well above based on the item, location, and supplier.  Thus,

Cassidy was at least nearing agreement with what Plaintiff had already been doing on his own in his proposals, but Cassidy's suggested language still was not entirely accurate.

221.  Plaintiff responded by questioning whether 18% was really the upper limit on gift card mark ups.  He also suggested that rather than saying the average was *probably* about 14%, WH should determine the actual percentage.

222.  Cassidy replied that 18% was the limit except for Amazon gift cards, for which the markup could go higher because they were considered premium cards.  He agreed that WH should not use vague terms like "probably" with a client.

223.  Cassidy's statement about an 18% limit *for gift cards* is an admission that the long-standing claim that markups range from 5% to 15% is a willful misrepresentation, even for gift cards.   The "probably closer to 14%" average also belies the long communicated position that markups "average 10% to 12%."

224.  Whatever merit there might be to Cassidy's suggestion that "conveying the markup on merchandise is difficult," calculating the markup on the face value of a gift card is simple and unambiguous, and if WH told clients and prospects that the markup range for gift cards was 5% to 15%, then *no* gift card should have ever been marked up 18%.

225.  Likewise, there should have been no ambiguity about the average markup for gift cards, and thus no need to quote a range of 10% to 12%.  The average should have been a single, unambiguous number.

226.  WH's efforts to obscure and obfuscate readily determinable precise numbers reflect the fact that the Company was willfully evasive in what it was telling clients and prospective clients about the true value of Points awarded to Client Employees.

227.   Still trying to navigate the disclosure problem without fully "coming clean," at the end of June 2021 Cassidy suggested language that fell far short of revealing the extent of WH's back end markups.  It mentioned that the WH store price was a "fully delivered price," and said that Client Employees redeeming Points for gift cards would have buying power between 80% and 90%.

228.   With regard to merchandise, Cassidy's suggested disclosure evaded the question of markups by saying that pricing was based largely on WH's supply network, the specific item, and the location of delivery and redemption.  The disclosure said these factors could create a rather wide range of pricing outcomes, ranging from below retail value to significantly more than retail value.  It said this variability reflected the challenges in offering merchandise globally.  No numerical information was provided.

229.   Cassidy's suggested disclosure language concluded by noting that WH works "collaboratively with our suppliers to reduce costs," when possible, and by focusing on the fact that the WH Store price for an item is the fully delivered cost, inclusive of taxes, delivery, etc.  It made no mention at all of the markup percentages for merchandise nor that these markups include profit to WH.

230.   Plaintiff did not respond directly to the inadequate disclosure language that Cassidy proposed in late June 2021, but two days after receiving it, he sent Cassidy an updated proposal for Client I.  It included the "up to three times market price" language, and revealed that Points buying power for gift cards could be as low as 80%.

231    On or about June 30, 2021, Plaintiff sent a proposal to Client I with a disclosure making explicit that the price for items redeemed from the WH Store could be up to three times the FMV.

232.    Subsequent to the proposal to Client I, similar disclosure language (i.e., price up to three times the FMV) was included in proposals sent to Client J (on or about July 15, 2021), Client K (on or about July 30, 2021), and Client L (in the first half of August 2021).

233.    Historically, when offering a price proposal to a prospective customer, WH's Sales Representatives were instructed to convey that the pricing model had only two components: (1) implementation costs, and (2) transaction fees on Points.  A few programs included PEPM as an alternative to transaction fees, but either a PEPM fee or a transaction fee on Points awarded would be a fully disclosed front end cost.

234.    In fact, though completely undisclosed, the back end profit margin was a third component.  Plaintiff's proposed language for Client I, Client J, Client K, and Client L did not address it directly, but disclosure that prices could be three times the FMV made clear how the extraction of profit affected the redemption part of a client's employee recognition program.

235.    The third component of the pricing is indirect because it does not bring in additional money to WH from the client.  Rather, the client buys less "recognition compensation" for its Client Employees because they do not receive the full benefit of the Points they are awarded – what they lose becomes additional profit for WH.

236.    Any disclosure that revealed the effects of back end profits was a huge problem for WH if it wanted to deny it was taking out profit on the back end.

237.   As of early July 2021, despite Plaintiff's numerous objections and warnings since March of 2019, and despite the fact that he was consistently using disclosure language regarding the fact that WH Store prices could be three times the FMV, nothing really had changed at WH with regard to back end profits.   The pitfalls of extracting profit from markups and trying to keep Client Employees from redeeming Points for "low margin" gift cards remained (and still remain) significant problems.

238.   As explained in detail below, Plaintiff's efforts to use more truthful disclosure language quickly resulted in accelerated retaliation against him.

239.   Meanwhile, WH's efforts to conceal the truth from clients and prospective clients continued unabated.   On or about July 1, 2021, Vitkofsky followed up with Whitman regarding a discussion they'd had the previous day about pricing for Client M, a potentially very significant client.   He assured her that he supported her efforts to keep Amazon gift cards and other low margin items out of the WH Store.

240.   Vitkofsky was concerned, however, about the "very competitive, complex sales processes," and he wanted to build on a $500,000 pilot project with Client M to tap into perhaps $20 million that the company was spending on recognition.   He thus proposed (1) making it more straightforward for Client M's Client Employees to find gift cards, (2) removing or suppressing any merchandise items that had significantly high markups, and (3) being transparent about the markup on gift cards.   He also said he would do his "very best" to keep Amazon out of the picture, which in itself makes clear WH was still looking to extract profit on the back end.

241.   Except for limiting the Amazon gift cards, Whitman had not reacted well when Vitkofsky made such suggestions during their discussion the day before, and he told Plaintiff and Cassidy that he'd had a very abrasive conversation with her about pricing. Apparently acceding to at least some of her wishes, he also told Plaintiff and Cassidy that WH would have to do what it could to keep Amazon out of the WH Store.  Again, the only reason to worry about Amazon gift cards was how they impact the ability to maximize undisclosed back end profits.

242.   Plaintiff replied that WH likely would not get the Client M business without allowing Amazon gift cards.  He had suggested to Client M that Amazon gift cards could be included, because he thought it would be better to have a huge account with smaller margins than to extract the highest margin possible from a $500K pilot.

243.   In response, Vitkofsky pushed back, and said evidence showed that when companies have Amazon gift cards on their employee recognition sites, the cards become upwards of 30% to 40% of all redemptions.  Once again, such a percentage of Amazon gift cards is a significant problem only if WH is trying to take out profit on the back end.

244.   Toward the end of July 2021, Plaintiff asked Rich Sorrentino ("Sorrentino"), a Senior Manager for Launch Success at WH, about whether he had ever received approval to unhide the gift cards for Client F (the client that wanted limits on markups, and where the CHRO had a limited budget).  Sorrentino responded that he was "pretty sure" he had been told to wait and see if the client asked.

245.   Plaintiff then "vented" to Sorrentino about how frustrating it was when WH intentionally made it difficult for Client Employees to find gift cards and otherwise tried

to force them to redeem for highly marked-up merchandise.  Plaintiff said he was especially frustrated because he could not get a clear answer from Whitman or the eCommerce team on exactly what the WH markups were.  He said the high markups were unethical and that WH's integrity had been sacrificed to squeeze out additional margin.  Sorrentino replied that he "100% agreed."

246.     On or about August 9, 2021, Harper, a WH Enterprise Sales Representative, asked a question of Plaintiff and other WH Enterprise Sales Representatives that revealed just how opaque and impenetrable the WH model for back end markups had become.  Even some relatively long-time managers could not grasp how the back end markups were supposed to work.  She said that Scott Andriano ("Andriano"), WH Sales Vice President, who had been with the Company for more than three years, was struggling with how to explain WH's "graduated pricing" (another term for the back end markup pricing).  She said that she and Andriano had spoken at length about graduated pricing with the procurement lead for Client N, and that Andriano was "caught up on two major points."  She asked if Plaintiff or the Enterprise Sales Representatives had anything in writing that would help Andriano understand graduated pricing that he might use with clients.

247.     Plaintiff was unclear what Harper wanted from him, and told her he was not sure if he understood her request.  He asked if Andriano wanted help on explaining gift card and merchandise markups, and noted that it was widely understood within WH that 85% to 95% purchasing power is not accurate.  Plaintiff also asked if Andriano's question was about the taxation on the FMV of items purchased with Points by Client Employees.

248.   Harper replied by explaining that the procurement person from Client N had zeroed in on the fact WH charges a transaction fee based on the *cost* of a Point, not on the *purchasing power* of the Point.  The person from Client N also had focused on the variation in back end margin.  Andriano, she said, had thought someone else might have a good way to explain the WH business model, but she then added, "there really is no way to put lipstick on the pig and make it look great."

249.   Harper also reported that the Client N procurement person apparently recognized what the back end markups meant for the bottom line, and that he'd said, "so this makes you more expensive than your competitors who charge a subscription, when we spend more money with you."

250.   As detailed below, on August 9, 2021, Plaintiff sent an email in which he formally complained to Human Resources ("HR") at WH about the Company's back end markup practices and the retaliation against him for insisting on telling the truth, but WH continued to resist full disclosure to its clients even after his complaint.

251.   On or about August 14, 2021, prompted by discussions with an employee from Client O about possibly setting up a recognition program for Client O, Plaintiff asked O'Sullivan about the back end markup questions that never had been resolved.   In particular, the Client O representative wanted to see an earlier proposal that had been put in place for Client P in May 2020, and Plaintiff wanted advice from O'Sullivan on how to explain the back end markup part of the earlier Client P proposal to Client O.

252.   The 2020 Client P proposal had claimed WH was "agnostic" about what awards Client Employees might select.  It also explained that the price for an item was the

"fully delivered price," which meant the Points being redeemed would pay for the item plus expenses like shipping and handling, taxes, packaging, documentation, transit fees, and insurance.  It claimed that WH's "operational efficiencies" meant purchasing power would be 85 cents to 95 cents of every dollar.

253.   Plaintiff told O'Sullivan he was uncomfortable with a disclosure such as the one provided to Client P, because it was based on back end markups in the 5% to 15% range, which was outdated.  He specifically asked O'Sullivan about what information he should convey about markups on gift cards, as opposed to markups on merchandise. Should he quote Client O the higher back end markups on premium cards like Amazon, or should he remain silent on that issue?  Plaintiff said he would hold off on sending anything to Client O until he heard from O'Sullivan about what approach to take.  Once again, Plaintiff never received a response, and once again, the issues created by extracting profit from markups remained unresolved.

254.   Because Plaintiff received no guidance from WH leadership on how to describe pricing and the back end profit margin accurately to clients and prospective clients, he did what he thought was best and he sent a truthful proposal to Client O on or about August 18, 2021.

255.   Plaintiff adopted a new approach with Client O, in which he made explicit, for the first time, that the WH pricing model includes three components: (1) implementation and launch, (2) ongoing service fees, and (3) *redemption markups.*  He made clear that the third component included a profit margin for WH.

256.    After August 11, 2021, Cassidy assumed responsibility for communicating with most of the clients for which Plaintiff was responsible, so Plaintiff does not know what eventually happened with the Client O proposal.  It is noteworthy, however, that even after he complained to HR, he could not get an answer to his persistent questions about how to explain back end markups to clients and prospective clients.

### C.    Complaints about Expiring Points and Tax Issues.

257.    Plaintiff, along with others at WH, complained regularly about the way in which the Company expired Points without fully disclosing the practice or the opportunity to restore Points once they were expired.

258.    For the most part, WH kept the money clients had paid for Points even if Client Employees never redeemed them and they expired.  WH had no default mechanism in place to remind Client Employees that they had Points available for redemption.

259.    Although Plaintiff's complaints about WH's Point expiration practices were regular and persistent, they were not documented as well as his complaints about back end markups.  Nonetheless, complaints about Points expiration were an additional source of friction with the Company's leadership during the entire time he was objecting to and complaining about markups.

260.    Yet another cause of friction between Plaintiff and WH leadership was his persistent complaints about the tax consequences of the Company's practices.   As explained in detail above, Points awarded to Client Employees count as reportable income at the time of the award.  If a Client Employee never redeems the Points, taxes are paid even though no benefit was realized.  Moreover, if Points are redeemed, the excessive back

end markup means the tax paid is too high.  In some cases, taxes can exceed the FMV of the item purchased with Points, especially in states or countries with high tax rates.  WH's exhortations to gross up pay were especially intense for clients with numerous Client Employees working in such jurisdictions.

### D. Workhuman Retaliates Against Plaintiff for His Efforts at Full Disclosure to Clients.

261.    Plaintiff's insistence on telling the truth led directly to retaliation against him. Ultimately, he had to resign when faced with the alternative of continuing to deceive clients and facilitate the Company's practice of taking money that rightfully belonged to Client Employees.

262.    After he first used the "up to three times actual cost" language in March 2021, and then persisted in seeking clarification on the true cost when Client Employees redeemed Points for merchandise, WH finally responded with an effort to force him to leave.

263.    On June 18, 2021, Vitkofsky first broached the subject of Plaintiff's demotion from Global Account Executive to Senior Enterprise Sales Executive. Supposedly, it was part of a planned reorganization, but only one other employee was involved.

264.    Plaintiff quickly expressed reservations about such a demotion to Vitkofsky, and no immediate steps were taken to make the change.

265.    When Plaintiff once again needed to send out proposals in late June 2021, they included the "three times actual cost" language he had used for Client H about three

months earlier in March, and the retaliation against him accelerated almost immediately. On July 6, 2021, Vitkofsky and Cassidy spoke with Plaintiff on the phone about the proposed demotion, and Plaintiff said he had considered it and decided that for professional and personal reasons he would prefer to remain a Global Account Executive.

266.   Plaintiff also told Vitkofsky that his wife was having health issues and was scheduled to have "major surgery" the following day (July 7, 2021), and that he was dealing with other "very serious" health issues in his family.  Thus, in addition to professional and career reasons for not accepting the demotion, it was necessary to reject it for the sake of his own mental health and for the wellbeing of his family.  The new position essentially would have doubled his workload, as he would still be responsible for many large "global accounts" in addition to scores of new "enterprise" accounts.

267.   Upon hearing of Plaintiff's family issues, Vitkofsky presented Plaintiff with the false choice of either taking the proposed demotion or taking a medical leave of absence, which was a completely improper attempt to use private information against Plaintiff to force him to leave WH.

268.   Additionally, Vitkofsky attempted to strong arm Plaintiff by suggesting he had performance issues.  Vitkofsky told Plaintiff "you are still being paid a salary" and "you need to do your job 100%."  This statement was an implicit threat as clearly there was an "or else" to follow up if Plaintiff did not "do his job 100%."

269.   Vitkofsky's hostility towards Plaintiff unequivocally showed that WH, contrary to how it portrayed itself in the marketplace, was taking an ice-cold bottom line

approach with Plaintiff.  He could either "get with the program" and stop complaining about fraud and deception or he could leave.

270.    Plaintiff made clear that while his personal issues weighed against accepting a demotion, he had no problem continuing with his job as a Global Sales Executive. Nonetheless, Vitkofsky reported his personal situation to HR.  Shortly thereafter, on July 21, 2021, Sharon Pollard ("Pollard") from the HR department set a "check in" call with Plaintiff .  Although she stated that "we haven't spoken in a while," Plaintiff, in fact, had never had a "check in" call with HR over his entire eight plus years with WH.  The call was obviously part of the effort to pressure him to leave.

271.    During the July 21, 2021 call with Pollard, she told Plaintiff that Vitkofsky had shared with her that Plaintiff was dealing with some personal matters, and she wanted to "check in" to see if he was all right.  Plaintiff pointed out that while he was dealing with very significant family matters (and that they were among the reasons he did not want to accept the demotion), if he needed help from HR, he was more than capable of seeking it himself.  He added that he did not appreciate Vitkofsky unnecessarily sharing his personal issues with others in the Company.

272.    It quickly became apparent to Plaintiff that his personal family issues were being used as a pretext for Pollard to sell him on accepting the demotion and ultimately to force him to leave WH.  During his call with Pollard, she made explicit that the Company had singled out Plaintiff because of his objections to the WH pricing model (i.e., the undisclosed back end profit margins).  She stated that Plaintiff had recently seemed upset. When he asked her to elaborate, she referenced his opposition to the markups.

273.    As Plaintiff had never once discussed the WH pricing model with Pollard or anyone else in HR, he found it odd that she would comment on his complaints about it. When he questioned her about why she was raising the issue, she admitted that she did not understand the WH pricing model, and it became evident that Vitkofsky had asked her to set up the call as part of the coercion and retaliation against Plaintiff.

274.    The call with Pollard was in fact a thinly veiled effort to establish a pretext for terminating Plaintiff as a disgruntled employee because of his increasingly frank objections to the back end markups and his complaints about Points expiration.  When Plaintiff reiterated that, on both a professional and personal level, he did not want the demotion, Pollard responded,"I guess we'll have to think about next steps."

275.    The pretext behind the "check in" with Pollard became blatantly obvious when neither she nor anyone else from HR ever followed up with Plaintiff about the supposed reason for the "check in" – the serious personal matters with which he was dealing.

276.    In between the July 6, 2021 call on which Plaintiff refused the demotion and early August 2021, he had continued to send out proposals with the same disclosure language he had used for Client I shortly before the July 6 call.  He sent out at least three such proposals to Client J, Client K, and Client L.

277.    By early August 2021, he was in the process of developing the proposal for Client O, in which he disclosed there was back end profit margin.

278.    Confronted with Plaintiff's ongoing efforts to provide truthful disclosures to prospective clients, WH decided he either had to take the demotion or leave the Company.

On Friday, August 6, 2021, Vitkofsky and Cassidy met with him and informed him that despite his objections, WH had reached a decision to demote him to Senior Enterprise Sales Executive.

279.    The next Monday (August 9, 2021), Vitkofsky sent an email to Plaintiff that began with a stern admonition that he modify his attitude and behavior.  Vitkofsky scolded that "[f]or too long, you've had an incessant and pervasive negativity that needs to stop."

280.    The so-called "negativity" was nothing more than Plaintiff's refusal to make false and deceptive claims on behalf of WH, his vocal opposition to the Company's fraudulent and deceptive practices, and his efforts to provide truthful disclosures to prospective clients.

281.    Vitkofsky's August 9, 2021 email also included inappropriate references to the health of Plaintiff's family members.  These health issues never impacted Plaintiff's ability to do his job as a Global Account Executive, but the demotion, along with Vitkofsky's admonition about Plaintiff needing to do his job 100%, would have impinged significantly on his ability to balance work with the needs of his family.  It effectively would have doubled his workload and thus required significantly more work hours and potentially far more travel.

282.    WH's treatment of Plaintiff and Vitkofsky's hard line insistence on "100% effort" (which after the demotion would have meant a significant increase in Plaintiff's workload) regardless of his family issues is directly at odds with the Company's public assertions and articles about how it pioneered the human-centered enterprise and how employers should "put the human first" with regard to work/life balance.

283. Moreover, the manner in which some of the private information Plaintiff disclosed to Vitkofsky and Cassidy about his family members' health was disclosed to others within WH violated provisions of the Company's handbook.

284. Vitkofsky's supposed expressions of concern about Plaintiff's family situation was patently insincere and offensive, as he explicitly told Plaintiff that unless his family circumstances required medical leave, he needed to do his job 100%, which, again, would have meant significantly more hours beyond the work he was doing as a Global Account Executive.

285. Plaintiff responded to Vitkofsky's August 9, 2021 email the same day by speaking on the phone with Pollard, and he followed up the call with an email in which he formally notified "Workhuman Human Resources that this recent and sudden demotion from a Global Account Executive to [a Senior] Enterprise Account Executive . . . is retaliation for my outspoken opposition against the fraudulent way the company portrays its business model to prospective customers."

286. Plaintiff's August 9, 2021 email to Pollard also addressed the way in which confidential information about his family's health had been misused. He then detailed the history of his opposition to fraud and deception and the consequences he had suffered for his efforts.

287. The August 9, 2021 email also addressed Vitkofsky's violation of the confidentiality provisions in the WH Handbook with regard to the information about Plaintiff's family's health issues. It quoted from page 12 the Handbook, which makes clear that all "employees must endeavor to deal ethically and lawfully with . . . [other]

employees . . . and should not [abusively use] privileged or confidential information . . ."
Vitkofsky clearly had violated this provision by telling others within WH about Plaintiff's
family health issues.  In particular, Vitkofsky told HR as part of the effort to create a pretext
for forcing Plaintiff to leave the Company.

288.   As described below, when Plaintiff retained counsel to assist him in asserting
his retaliation claims, WH initially had Vitkofsky address communications from counsel
by sending emails *directly to Plaintiff.*  Thus, the person who had retaliated by, among
other things, breaching Plaintiff's confidentiality, was initially the person tasked with
responding to Plaintiff's retaliation claims, which in effect was a continuation of the
retaliation.

289.   Two days after Plaintiff's email to Pollard, on August 11, 2021, he received
an email from Nick Solis ("Solis"), an attorney in the WH Legal Department, requesting
that he provide information to facilitate an investigation into his claims about false
statements from the Company and retaliation for objecting to those false statements.  Solis
wrote that "[g]iven some of what you've stated in that previous email, for us to properly
investigate the matter, we will have to interview you and apprise/interview sales leadership,
as you've accused them of retaliating against you with the recent title/territory change.
Please let us know your availability for an interview next week with team members in
HR/Legal."

290.   Plaintiff responded to Solis' email by explaining that if WH legal was going
to be involved in the investigation, he thought it would be best if he first consulted with his

own lawyer.  To Plaintiff's knowledge, the investigation suggested by Solis has never been conducted.

291.    A genuine and thorough investigation would only have verified that Plaintiff's complaints and objections were all true and well-founded.  Instead of conducting such an investigation, the Company made a "stop complaining and accept your demotion, or be terminated" threat, as detailed below.

292.    Neither Solis nor anyone else from WH followed up on the supposed need to interview Plaintiff.  He never was interviewed about his complaints nor did HR ever bother to follow up in any other way with regard to his complaints.

293.    WH kept pressuring Plaintiff to accept the demotion or termination.  On August 18, 2021 (the same day that Plaintiff sent a proposal to Client O in which he explicitly disclosed back end profit margin), Vitkofsky (one of the principal perpetrators of the retaliation against Plaintiff) again sent him an email that made explicit Plaintiff's choice was either demotion or termination with some kind of severance.  The email included no details about any severance, though later Plaintiff was told it would have a total value of about $800,000.

294.    On the morning of August 23, 2021, Vitkofsky sent a follow-up email reminding Plaintiff a response was expected by the end of the day or else Workhuman would move forward with terminating him.

295.    Also on August 23, 2021, about twelve hours after Vitkofsky's morning email, Plaintiff's counsel sent a letter to Lauren Zajac, WH's in-house lawyer, laying out Plaintiff's whistleblower retaliation claims.

296.    WH eventually withdrew the demotion demand, but only after the August 23, 2021 letter from Plaintiff's counsel to Zajac.  Moreover, the Company never withdrew the baseless admonition about his negativity or performance; never apologized for the effort to use his family's health issues against him; and most importantly, never addressed his claims of fraud and retaliation.

297.    In offering to relent on the demotion, WH continued to give no indication that it would discontinue its misrepresentations about back end markups to the Company's clients and prospective clients and no indication that it would cease the undisclosed practice of extracting back end profit through markups.

298.    Faced with the choice of leaving WH or continuing to participate in fraud and deception, and continuing to work with Vitkofsky, who was one of the principal people who had retaliated against him, Plaintiff resigned on September 13, 2021.

299.    WH's actions with regard to Plaintiff's demotion and the communications to him about supposed personal issues, attitude, and level of effort, were in fact an attempt to establish pretextual reasons for terminating him, or in the alternative, to force his resignation.  The misuse of private information about Plaintiff's family and the sudden and totally unprecedented meeting with HR were part of the same pattern.

### E.    Plaintiff's Damages.

300.    Over his last three full years with WH, Plaintiff's average total annual compensation came to $1,094,846.74 ($3,284,540.22 over three years).

301.    Since his September 13, 2021 resignation, Plaintiff has found other work, but his total annual compensation now comes to only $350,000.

302.    Plaintiff is 50 years old and plans to work until he is 70.  Thus, he is facing 20 years with an annual income reduction of almost $745,000.  His total lost compensation damages thus come to $14,900,000.

303.    In addition, Plaintiff has suffered significant emotional harm, not only from WH's effort to force him into dishonest business practices, but also from the way in which the health of family members was used to make threats against him.

304.    The precise total amount of Plaintiff's damages cannot be determined at this time, but they clearly exceed $75,000.

**F.    Defendant's Practices of Taking Undisclosed Back End Profits and Expiring Client Employees' Already Paid for Points Constitute a Violation of Several Laws.**

305.    Defendant engaged in a concerted ongoing scheme to take from Client Employees a significant portion of the value of the Points they were awarded as part of the recognition programs Defendant ran for its clients.

306.    Defendant effectively converted a percentage of the Points value to its own benefit by taking undisclosed back end profits when Client Employees redeemed their Points.

307.    Defendant also engaged in a scheme to convert the value of unredeemed Points to its own benefit by expiring those Points without informing either its clients or Client Employees.

308.    The back end profits scheme constituted an intentional course of conduct through which Defendant knowingly deprived Client Employees of their right to realize the full benefit of the Points they had been awarded.

309.    The Points expiration scheme constituted an intentional course of conduct through which Defendant knowingly deprived Client Employees of the right to realize the benefit of the Points they had been awarded.

310.    Under the FCFA, Defendant is subject to criminal liability for committing a felony in the first degree.

311.    Under Fla. Stat. § 812.014, Defendant is criminally liable for theft because Defendant knowingly obtained the property of Client Employees with the intent to appropriate the property to its own use.

312.    Under FDUTPA, Defendant has engaged in unconscionable trade practices by deceiving clients about the true cost of the recognition services they were purchasing, and by taking from Client Employees a large part of the value of the Points on which they paid taxes.  The conduct of Defendant constitutes unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of trade or commerce.  It offends established public policy and is immoral, unethical, oppressive, and unscrupulous.

313.    Under the MLS, Defendant is subject to criminal liability for larceny.

314.    Defendant's misrepresentations to its clients about (1) the business model on which it based the sale of its services to clients, (2) the taking of back end profits, and (3) the expiration of Points constitute deceptive and unfair trade practices under the Massachusetts Consumer Protection Law, Mass. Gen. Laws Chapter 93A.

315.    Defendant's back end profits scheme and its misrepresentations to its clients also violated anti-fraud and consumer protection statutes in states other than Florida and Massachusetts.

## CAUSES OF ACTION

### COUNT 1

### Violation of the Florida Private Sector Whistleblower Act

316.    Plaintiff restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

317.    Plaintiff complained about and objected to Defendant's management about Defendant's illegal scheme to take part of the Points value awarded to Client Employees for its own benefit as back end profit.

318.    Plaintiff refused to participate in the illegal scheme to take part of the Points value awarded to Client Employees.

319.    Plaintiff also complained about the undisclosed expiration of Points.

320.    The scheme to take part of the value of Points belonging to Client Employees constituted a violation of the Florida Communications Fraud Act, Fla. Stat. § 812.014, and the Massachusetts Larceny Statute, as well as the anti-fraud laws of other states.

321.    Misrepresentations by Defendant to its clients about the real cost of the recognition programs it ran for those clients (including taking the value of expired Points and realizing undisclosed back end profits) constituted violations of the Florida Deceptive and Unfair Trade Practices Act and the Massachusetts Consumer Protection Law, as well as the consumer protection laws of other states.

322.    Defendant retaliated against Plaintiff for his complaints about the Points value scheme and the Points expiration scheme by attempting to demote him, raising questions about his supposed performance and supposed negative attitude regarding

69

participation in its illegal profit taking scheme, and making improper use of information about the health of his family members.

323.   Defendant insisted that if Plaintiff continued his employment with the Company, he would have to go along with the illegal misrepresentations about back end markups, which meant Plaintiff faced the choice of facilitating a violation of the law or resigning.

324.   Plaintiff was left no choice but to resign, which makes his resignation a constructive discharge.

325.   Plaintiff's forced resignation has caused him to suffer damages well in excess of $75,000.

## COUNT 2

### Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213 ("FDUTPA")

326.   Plaintiff restates and re-alleges the allegations contained within the preceding Paragraphs 1 through 325 as though fully stated herein.

327.   Defendant has engaged in unconscionable trade practices by persecuting Plaintiff with adverse employment practice and damaging falsehoods on claims that are utterly false and contrived – all to overwhelm him to force him to abandon or settle cheaply his whistleblower claims.

328.   The conduct of Defendant constitutes unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of trade or commerce.

329.    The conduct of Defendant offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and the public.

330.    Plaintiff has suffered damages well in excess of $75,000 because of Defendant's actions.

**COUNT 3**

**In the Alternative, Wrongful Discharge Under the "Public Policy" Exception to the Massachusetts Employment At-Will Rule**

331.    Plaintiff restates and re-alleges the allegations contained within the preceding Paragraphs 1 through 315 as though fully stated herein.

332.    Plaintiff pleads here in the alternative should the court find that Massachusetts law rather than Florida law should be applied to decide Plaintiff's claims.

333.    Plaintiff complained about and objected to Defendant's management about Defendant's illegal scheme to take part of the Points value awarded to Client Employees for its own benefit as back end profit.

334.    Plaintiff refused to participate in the illegal scheme to take part of the Points value awarded to Client Employees.

335.    Plaintiff also complained about the undisclosed expiration of Points.

336.    The scheme to take part of the value of Points belonging to Client Employees constituted a violation of the Florida Communications Fraud Act, Fla. Stat. § 812.014, and the Massachusetts Larceny Statute, as well as the anti-fraud laws of other states.

337.    Misrepresentations by Defendant to its clients about the real cost of the recognition programs it ran for those clients (including taking the value of expired Points

71

and realizing undisclosed back end profits) constituted violations of the Florida Deceptive and Unfair Trade Practices Act and the Massachusetts Consumer Protection Law, as well as the consumer protection laws of other states.

338.   Defendant retaliated against Plaintiff for his complaints about the Points value scheme and the Points expiration scheme by attempting to demote him, raising questions about his supposed performance and supposed negative attitude regarding participation in its illegal profit taking scheme, and making improper use of information about the health of his family members.

339.   Defendant insisted that if Plaintiff continued his employment with the Company, he would have to go along with the illegal misrepresentations about back end markups, which meant Plaintiff faced the choice of facilitating a violation of the law or resigning.

340.   Plaintiff was left no choice but to resign, which makes his resignation a constructive discharge.

341.   Plaintiff's forced resignation has caused him to suffer damages well in excess of $75,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests relief from this Court as follows:

a.    Judgment in his favor and an award of damages for back pay, lost benefits, and front pay.

b.    An additional award of damages for the emotional distress Plaintiff suffered.

c.      An award of the costs of this action, including attorneys' fees.

d.      An award to Plaintiff of all other just and proper relief to which he may be

        entitled.

## JURY DEMAND

Plaintiff demands trial by jury on all issues triable of right by jury.

Dated: March 23, 2022.

**LAW OFFICE OF RICHARD E. JOHNSON**

/s/*Richard E. Johnson*
Richard E. Johnson (Fla. Bar No. 858323)
314 West Jefferson St.
Tallahassee, FL 32301
rick@rej-law.com
850-425-1997

**SCHAEFER HALLEEN, LLC**

Bert Black (Minn. Bar No. 345052)
(pro hac vice admission to be applied for)
Lauren A. D'Cruz (Minn. Bar No. 395331)
(pro hac vice admission to be applied for)
412 South 4th St., Suite 1050
Minneapolis, MN 55415
bblack@schaeferhalleen.com
ldcruz@schaeferhalleen.com
612-294-2600

**ATTORNEYS FOR PLAINTIFF**